No. 54,577

STATE OF KANSAS, *Petitioner,* v. JAMES S. PHILLIPS, SR., *Respondent.*

(656 P.2d 770)

*Per Curiam:* This is an original action filed by the Disciplinary Administrator against James S. Phillips, Sr., an attorney admitted to the practice of law in the State of Kansas. The complaint arose when a decision of the Court of Appeals ordered a new trial after finding that David Richard was denied a fair trial due to the conflict of interest of the respondent. See *In re Estate of Richard,* 4 Kan. App. 2d 26, 602 P.2d 122 (1979), *rev. denied* 227 Kan. 927 (1980). A panel of the Board for Discipline of Attorneys found in part that the respondent violated the Code of Professional Responsibility (DR 5-105 and DR 5-101, [230 Kan. cxx-cxxi]) by representing a client in a cause where the client's interests were in conflict with those of David Richard whom respondent had previously represented. The panel recommended public censure by this court. Exceptions to the report of the panel were filed by the respondent.

Summarized, the evidence on the complaint resulting in the panel's recommendation was that David Richard and his family moved from Wichita to live and work on the farms of his uncle, Alphonse Richard, which were located near Brewster, Kansas. Respondent had represented David on many matters, some before and some after the move. After Alphonse's death, with David's consent, respondent represented the estate of Alphonse Richard. David claimed that "Uncle Alf" had promised him the farm and implements if David and his wife would farm the land and look after Alphonse. When this claim was tried in *In re Estate of Richard,* David objected to respondent representing the estate but the objection was successfully resisted. Respondent continued to represent the estate in the trial on David's claim. Respondent's representation of the estate and statements suggested to the trial court negative inferences about David's claim. David thought prior knowledge gained from him by respondent as his lawyer could be used to cross-examine David and his wife at the trial of David's claim.

A majority of the court agrees with the panel's conclusions and recommendation of public censure.

We find that the respondent has violated the Code of Profes-

sional Responsibility as determined by the panel and that its recommendation of public censure should be accepted and approved by this court.

IT IS THEREFORE BY THE COURT ORDERED that James S. Phillips, Sr., be and he is hereby disciplined by this court by public censure and he is hereby ordered to pay forthwith the costs of this proceeding.

IT IS FURTHER ORDERED that this Order of Public Censure be published in the official Kansas Reports.

By order of this court this 14th day of January, 1983.

HOLMES, J., not participating.

HERD, J., dissenting: I respectfully dissent from the majority holding that James S. Phillips, Sr., violated DR 5-101 and DR 5-105(b) (230 Kan. cxx, cxxi).

D.R. 5-101 provides:

"*Refusing Employment When the Interest of the Lawyer May Impair His Independent Professional Judgment.*

"(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

"(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify;

"(1) If the testimony will relate solely to an uncontested matter.

"(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

"(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

"(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

### D.R. 5-105(B) and (C) provide:

"*Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.*

. . . . .

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent

multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

For a complete understanding of the issues it is necessary to again recite the facts. The respondent, James S. Phillips, Sr., a Wichita attorney, represented David Richard during the late 1960's and early 1970's. In 1974 Alphonse Richard, the uncle of David Richard, contacted David and requested him to move to Brewster and assist Alphonse in his extensive farming operation. Alphonse, elderly and in failing health, could not properly operate his 2400 acres. David accepted the invitation and moved his family to Brewster in August 1974. Alphonse needed legal assistance; David recommended his own attorney, James S. Phillips, Sr. Mr. Phillips' contact with Alphonse was primarily by telephone at first. Phillips drafted a power of attorney in David for Alphonse which was executed November 14, 1975, and later assisted in the eviction of some farm tenants.

David Richard leased Alphonse's land on a standard one-third/two-thirds share crop basis. Phillips drafted a written lease in 1975 and later an extension of the lease. David was quite active under the power of attorney, so active in fact it made other relatives nervous. Alphonse Richard was unmarried and as far as anyone knew had no will. On October 8, 1976, Loretta Gross, a niece, petitioned the district court to appoint herself guardian of Alphonse Richard and conservator of his estate. David, on behalf of his uncle, called Phillips to defend against the action. Phillips discussed his employment with Alphonse and filed appropriate pleadings. J. Ronald Vignery was attorney for Loretta Gross and the court appointed Perry Warren guardian ad litem for Alphonse. Before the case could be resolved, Alphonse Richard died on March 6, 1977, leaving an estate valued in excess of $1,000,000.

Both family factions vied for administration of the estate. Two petitions for appointment of an administrator were filed simultaneously on March 7, 1977. Respondent, representing David Richard, asked that David Richard or in the alternative Lawrence Bruggeman, be appointed and Mr. Vignery, representing Germaine Jacobs, a sister of the deceased, asked that Mrs. Jacobs and her son John be appointed. At the hearing on the petitions before Judge Birney, it became obvious to the court a family squabble was brewing. This colloquy ensued:

"THE COURT: Well, the Court thinks this case is of sufficient magnitude that we have the questions involved as to the handling of the real estate and also the handling of the personal property, which I understand includes both money and possible stock and bonds and farm machinery and most assuredly has both an income tax and an estate tax question involved. The Court has been rather adamant that he wanted to appoint Mrs. Jacobs and Mr. Bruggeman to handle this estate in harmony, and you understand that Mr. Vignery?

"MR. VIGNERY: Yes sir, Your Honor.

"THE COURT: As I understand, you're making no objection to those appointments.

"MR. VIGNERY: No, I'm not.

"THE COURT: And Mr. Phillips, is that your situation? You understand the Court wants to make those appointments and you're not objecting to them?

"MR. PHILLIPS: Yes, I do, Your Honor, and we have no objection.

"THE COURT: Very well, those two people will be appointed to act and serve jointly and I want to say that it seems to me during the operation of this matter that while there has been a certain bit of inclination on the part of people who are heirs of the deceased to throw rocks at each other, that I can't help but observe these people all seem to me to be extremely fine people. At all times, this matter of throwing rocks is a real, real bad thing; but most importantly I want to say that the Court certainly appreciates the attitude that's been taken in this case by the attorneys. The attorneys have really worked diligently at an effort to hold down the expenses of this matter and to handle the estate in a manner that's going to be well handled as cheaply as possible, and at the same time that all these people are going to have a voice. So as I understand it, Mr. Vignery, there is no real reason why you can not accept the appointment to serve as attorney for these co-administrators, is there?

"MR. VIGNERY: I see no reason why there isn't.

"THE COURT: And Mr. Phillips, is there any reason why you can't accept an appointment to serve and represent both these administrators?

"MR. PHILLIPS: There is no reason, Your Honor.

"THE COURT: Very well. In that case, both of you gentlemen will be appointed as attorneys to represent these two co-administrators.

"Now, it's been called to the Court's attention that it's entirely possible that there may grow [out] of the operation of this estate a diverse interest of the lessee of this land and the duties of the administrator. Now, the Court takes judicial knowledge of the fact that Mr. Phillips has appeared in the conservator matter and in this case as an attorney for David Richard, and that Mr. Vignery has appeared as attorney for the people who asked for the appointment of the conservator, and that if there should at any time appear to be a conflict between your duties in representing the administrators and the duties of the administrators themselves in working out any conflict that may arise between the estate and David Richard as lessee, that the Court would entertain a petition at that time to appoint a special administrator for that sole purpose of handling this question of any difficulties that may arise in the handling of the lease on the land or the personal property, which as I understand consists mostly of machinery. Are there cattle out there?

"MR. PHILLIPS: No cattle, no livestock.

"THE COURT: Well, you understand, gentlemen, if there should arise that

situation where it becomes embarrassing or unethical for the attorneys representing the administrators to proceed with any type of thing that the Court will feel free to appoint a special administrator to iron out any difficulties. I want to urge that whatever people are in this room that are interested in this estate that I know you've all heard many, many times that somebody died and left an estate and lawyers got it all. I know you have every right to come into the court room with every suspicion of that going to happen at any time an estate arises. Well, I've been at the bar now for over 40 years, getting close to 45 years, and I know that sometimes it occurs; but this might surprise you; that that always occurs because that's what the people want, and that grows out of rock throwing and name calling and suspicion and that type of thing on the part of the people, and they make their lawyers do an uncalled for amount of work, and that does run into tremendous expense, and means that estates are largely depleted. I want to comment to you people that you've been extremely fortunate in the selection of your attorneys because they've worked their heads off today to avoid that very thing happening. Now, in this case they could probably enhance their fee no end by, instead of making every effort to cooperate and to work this thing out harmoniously if they'd made every effort to have you people say nasty things about each other, then they would have become much richer than what they're doing. It's an extreme pleasure to this Court to see attorneys who are devoted to their clients to the point that they're working for the benefit of their clients. I certainly want to assure you that these gentlemen have done that in this case, and I want you to cooperate with them in every shape or form, and I want to say to all of you, the heirs who are present, any time you have any question, logical or illogical, sober or funny or senseless, if you have any questions of any kind, ask them about it. You call Mr. Phillips in Wichita if you hear that there is some kind of a story about what you can do and can't be done, call Mr. Phillips in Wichita. I'm sure he'll answer you, or call Mr. Vignery, wherever you are. I hope that all of you keep yourself well-informed, because if you keep yourself well-informed, there is going to be no trouble in this matter at all. Is that right, Mr. Vignery?

"MR. VIGNERY: Yes, sir.

"THE COURT: Mr. Phillips?

"MR. PHILLIPS: That is correct, Your Honor.

"THE COURT: There will be no trouble at all, and any time you want to know anything, you gentlemen will be free to give them any information. So if you hear some rumors, ignore the rumors, go to the men and ask them about it.

"So that's the appointment, gentlemen, and I think that's all the remarks the Court cares to make."

Both family factions including David Richard approved the court's action in appointing the co-administrators and Phillips and Vignery as attorneys for them. Phillips immediately informed David Richard he would have to retain other counsel on matters adverse to the estate. Mr. Richard did not object to this arrangement. He stated he felt it was to his advantage to have his former attorney represent the administrators and look out for his interests in the estate.

Sometime prior to August 1, 1977, David Richard employed Thomas R. Oglevie of Goodland as his attorney. Phillips delivered all of David's files to David.

In the meantime David Richard had been appointed special administrator of the estate for a brief period. Phillips assisted Richard in closing the special administration on April 22, 1977. He also helped Richard prepare a claim for services and expenses in the amount of $1,841.05. The administrators denied the claim and put David on strict proof. The dual role Phillips engaged in was criticized by complainant but the panel called it mere housekeeping chores in the administration of the estate. I agree.

On September 2, 1977, David Richard filed a petition for specific performance of an oral contract he claims he had with Alphonse Richard wherein David was to receive the entire estate in consideration for his taking over the farming operation and caring for the decedent. Thomas Oglevie was his attorney.

On October 7, 1977, the administrators filed their answer denying David's claim and counterclaimed for $17,774.64 for wrongful expenditures under the power of attorney. $9,474.54 of the amount claimed had been paid to respondent for representation of decedent in the guardianship proceedings.

Mr. Oglevie discussed the possibility of disqualifying respondent for a conflict of interest with David Richard prior to filing the action for specific performance. Mr. Richard declined to permit such action.

On June 26, 1978, the trial of David Richard's claim began. All went tranquilly until Mr. Phillips commenced objecting to questions propounded to David. It then came home to David Richard that Phillips could possibly possess information damaging to his case. He had Mr. Oglevie move to disqualify Phillips from assisting in cross-examination of his wife; Oglevie then broadened the motion to oust respondent from the case. The court took the motion under advisement while he read the transcript, then denied the motion. The district court opinion denying David Richard's claim and granting in part the counterclaim in the amount of $10,502.40 was rendered September 14, 1978. On appeal the Court of Appeals reversed and granted David Richard a new trial, stating:

"Under the circumstances of this case, counsel should have voluntarily withdrawn; and upon counsel's failure to voluntarily withdraw, the trial judge should

have removed him." *In re Estate of Richard,* 4 Kan. App. 2d 26, 34, 602 P.2d 122 (1979).

From that opinion the disciplinary administrator felt impelled to file this complaint.

This is not an easy case. The hearing panel struggled with it and failed to agree on many issues. The case has now been winnowed down to one issue: Did David Richard knowingly and willingly waive his right to confidential communications with respondent? It is clear he willingly waived this right. The question is how knowing was his waiver. David claims it was totally unknowing because he was promised by respondent he would get "insider" treatment by having his own attorney representing the administrators. Instead, David Richard's attorney, Tom Oglevie, testified on cross-examination as follows:

By Mr. Hensley:

"Q. Tom, did you find that you could always believe everything David Richard told you about everything?

"A. With 100 grains of salt.

. . . .

"Q. Did you have more or less confidence in the truth of what David Richard told you than you did in the truth of what your clients as a rule did?

. . . .

"A. My impression and experience with David was that he was very paranoid, and I made up my mind early in the game that I wanted extrinsic proof, independent proof to verify everything of merit that he told me regarding the merits of this claim."

Mr. Olgevie testified that, "on the specific directions of David Richard," he did not formally move to disqualify respondent until the trial.

He went on to state in that regard on cross-examination:

"Q. But he was aware Jim Phillips was the estate's attorney because you told him in no uncertain terms, didn't you?

"A. I most certainly did.

. . . .

"Q. David Richard of course knew Jim Phillips was attorney for the administrators from April 7, 1977, right up until you made this motion on June 26, 1978, 16 and a half months, right?

"A. Yes.

"Q. And during that entire period of time he refused to permit you to move to disqualify Mr. Phillips in spite of your continuing suggestions that should be done?

"A. Yes.

. . . .

"Q. And David Richard made it very clear to you that he rejected your advice and wanted Jim Phillips to stay exactly where he was, yes or no.

. . . .

"A. Very definitely."

In cross-examination of Mr. Vignery the following occurred: By Mr. Hensley:

"Q. A question is this, I believe. Did you ever obtain any information from Jim Phillips, Sr., about David or Fayetta Richard of a type that you would have considered confidential inherent in his previous relationship to them as attorney that worked against them in your representation of the estate either at trial or at any other time?

"A. No.

"Q. And I'd ask if the inverse question be true. Are you aware of any occasion in which Jim Phillips' special knowledge as a co-attorney for the co-administrators inured to the benefit of David or Fayetta Richard with respect to any confidential information Mr. Phillips obtained from you or from the administrators?

"A. No."

David Richard was called back for further testimony. Chairman Patterson questioned David. He stated that Mr. Phillips had told him since he was an heir to the estate Phillips would be representing him as well as others in the probate proceeding. This question followed:

"Q. He did explain to you that if you presented a claim against the estate not as an heir but as someone who had contracted with your uncle before death, you'd have to get separate counsel?

"A. Yes."

Mr. Hensley elicited this information in cross-examination of Mr. Richard:

"Q. Presume with me a respected member of this Bar testified yesterday from the outset when you came in to see him he explained to you that Mr. Phillips was, in his opinion, in a conflict of interest position with you and should be removed from his position, Mr. Phillips' position as co-counsel for the co-administrators. Presume also that Mr. Oglevie testified that you said, 'Jim Phillips is on my side, I want him where he is, don't get rid of him.' Now if that was Mr. Oglevie's testimony, was that false testimony?

"A. No, I think that would be pretty close."

Laurence Bruggeman's testimony on cross-examination was also revealing:

"Q. Now, did Jim Phillips ever suggest to you anything different than you should represent the best interest of the estate?

"A. No."

It is axiomatic that an attorney cannot represent two clients on

opposite sides of a controversy unless he has the consent of both. DR 5-105(C). That is exactly what happened here. David Richard and his sisters were involved in a heated controversy with Germaine Jacobs and her family over administration of Alphonse Richard's estate. It was a classic family quarrel. The two factions, with their lawyers, at the urging of the judge arrived at the compromise agreement where both sides could participate in the administration of the estate. Everyone was pleased. The judge explained how controversies between the administration would be resolved. Phillips told David Richard he would have to obtain outside counsel if he pursued a claim against the estate. David Richard clearly understood that. He hired other counsel who apprised him of the consequences of having Phillips represent the estate against David's claim. David continued to insist Phillips should not be challenged. It was not until the trial was in progress, some sixteen and one-half months later, that David objected. Phillips did not voluntarily step aside because David's claim was for the entire estate. Phillips had pledged, by accepting employment, to protect the estate. To keep his commitment he had to do his best to protect the corpus of the estate which was under attack. Phillips had been released from his duty to David except as an heir, and had taken on a new obligation which he was diligently discharging.

Complainant has the duty of proving by clear and convincing evidence James Phillips, Sr., accepted employment by the Alphonse Richard Estate without the consent of David Richard. *State v. Freeman,* 229 Kan. 639, 644, 629 P.2d 716 (1981). I find the opposite true. Phillips accepted the employment, not only with the consent of David, but with the actual urging of David. By such acts David clearly waived the confidentiality of the attorney-client relationship.

James S. Phillips, Sr., should be exonerated from the charge of ethical violations.

PRAGER, J., joins the foregoing dissenting opinion.